HARRIS *v.* GILMORE.

4-5357                                    124 S. W. 2d 810

Opinion delivered February 6, 1939.

642

*Marsh & Marsh,* for appellant.

*T. P. Oliver,* for appellee.

MEHAFFY, J. Appellant, Ida Harris, owned certain property in El Dorado, Arkansas. On November 16, 1937, appellant filed her complaint in Union chancery court alleging that she employed and appointed appellee, J. D. Gilmore, as her agent to look after her property, collect the rent and keep the taxes paid; that he accepted said agency, took charge of the property, and has had charge ever since that time; that he had collected the sum of $120 or some other sum unknown to the appellant, and he had never accounted to her therefor; that he assumed charge of the property with the intent to defeat her of her rights and deprive her of title; he, learning that said property had forfeited for taxes and been sold to the State of Arkansas, without advising appellant, obtained a deed from the Commissioner of State Lands, and is now claiming to be the owner.

Appellee filed answer denying that appellant ever placed the property in his hands; denied that he had ever collected any rent or that it was his duty to redeem the property from the tax sale. He admitted that he applied to the Commissioner of State Lands and paid $29.75 and received a deed on October 27, 1936; admits that he never accounted to appellant, and alleges that after he secured the deed he made improvements on the property amounting to $388.90.

The appellant, Ida Harris, testified in substance that she lived in Overton, Texas; that prior to moving there she lived at 907 Raymond Street, on lot 2, block 2, McHenry's revised addition; that she went to Texas in 1931, and came back in January, 1936, to get someone to look after her property, because her brother, who had been living on it, had died in the fall of 1935, and that she got appellee, J. D. Gilmore, to look after the property. He was to look after the property, rent it for $5 per month, and he was to receive one-half of the rent; her brother had been living in her house, and it was not rented at the time he died, and when he died she had no one to look after it, and she employed Gilmore as her

agent; after her brother died she came back and made the contract with Gilmore; she told him to pay the taxes and collect the rent; she failed to pay the taxes in 1935 and 1936, but paid them in 1934; she wrote Gilmore after she had turned the property over to him inquirin about it, but he did not answer the letter and did not tell her that the taxes were delinquent; she found that out by her daughter writing her; she wrote him a month or two after she turned the property over to him in 1936; she then wrote to C. E. Love, county clerk, and he wrote her about the taxes; when she received this letter she knew the taxes were delinquent for 1932. She then wrote to Mr. Otis Page wanting to redeem the property and received a letter from him stating that Gilmore had purchased it; that is the way she found out Gilmore had a deed; the taxes were not delinquent when she left here, but were delinquent for 1932.

Velma Goodwin testified that she lives in El Dorado; knew Ida Harris and J. D. Gilmore and heard their conversation in January, 1935, about Gilmore looking after the property; she was with Ida Harris and had started to see Gilmore and passed him, and Ida Harris called him and asked him to look after her property, rent the house, and if anything went wrong to let her know; Gilmore was to have half of the rent; Gilmore agreed to this.

J. D. Gilmore, the appellee, testified that he never had a conversation with Ida Harris about the property; did not collect any rents for her; that he put Dismuke in the house in November, 1936; that Dismuke asked who owned the house, and he told him that at present he, Gilmore, had a state deed to it; that Ida Harris used to own it, and that it was all right for him to live in it. The deed to Gilmore was introduced in evidence. Dismuke lived there quite a while. Ida Harris wrote him a letter in May, 1937, that she heard he was repairing the house.

He was asked when was the first time he knew this lot in controversy had been forfeited for taxes; he said he did not know it until he went to pay his taxes and found it was delinquent; and had to get the clerk to get it straight; she showed him where the land had gone

delinquent, and told him that if he wanted to buy it, then was the time. He wrote to Little Rock and got the deed. The first tenant he placed on the property was Roberta Sherer, who lived on it before Dismuke; Ida Harris gave her permission to move in; he told Dismuke that Ida Harris had owned the place, but he now owned a deed to it.

Dismuke testified that he approached Gilmore for permission to move into the property in November, 1936; that Gilmore told him the property belonged to Ida Harris, and that Dismuke stayed there from November to May, and the house was in such condition that he would not pay rent and Gilmore would not repair it; Gilmore told him he would have to pay rent or move out, and Dismuke made some repairs on the house himself. Gilmore told him when he moved in that it was Ida Harris' property. When he moved out Gilmore showed him the deed, but did not show it to him when he moved in.

Roberta Sherer testified that while she lived in the house in the spring of 1934 Ida Harris came and asked her if she would stay until she came back without rent; no one was with Ida Harris, but Mary Swarn was with witness; she stayed until the house got so bad she had to move out.

Mary Swarn testified that Roberta Sherer moved into the house in 1934 and stayed there until 1936.

Ida Harris testified that she was not here in 1934, and that her brother had charge of the property.

On March 30, 1938, a decree was entered as follows:

"On this the 30th day of March, 1938, this cause coming on to be heard, the same having been continued from Wednesday, March 23rd, the plaintiff being represented by N. C. Marsh, Jr., and the defendant being represented by T. P. Oliver, trial is resumed, the testimony of witnesses continued and completed, the court being well and sufficiently advised, doth decree for plaintiff for property charged with four hundred eighteen and 75/100 ($418.75) dollars improvements, less rent at five and no/100 ($5) dollars per month to date of improvements and six and no/100 ($6) dollars since the date of improvements, said property being lot two, block two,

McHenry's Revised Addition to the City of El Dorado, Union county, Arkansas, that said property be charged with improvements thereon in the sum of four hundred eighteen and 75/100 ($418.75) dollars, less rent at five and no/100 ($5) dollars per month to date of said improvements and six and no/100 ($6) dollars since the date of improvements.''

Thereafter appellee filed motion for a decree *nunc pro tunc*. The court then, on June 1, 1938, entered a decree restoring the property to the appellant, but giving the appellee a lien on the property for the amount of improvements he had put on there, less the rent.

The appellant excepted and prayed an appeal to the Supreme Court, which was granted.

The appellee states that the only question involved in this case is whether or not the appellee is entitled to recover for certain improvements made on the property. He does not argue that the court erred in decreeing the property to appellant and does not appeal from that decree. The court necessarily found that appellee was the agent of appellant, and this finding is supported by a preponderance of the evidence.

Appellee relies on § 13884 of Pope's Digest which is as follows: ''No purchaser of any land, town or city lot, nor any person claiming under him, shall be entitled to any compensation for any improvements which he shall make on such land, town or city lot, within two years from and after the sale thereof; for improvements made after two years from the date of sale the purchaser shall be allowed the full cash value of such improvements, and the same shall be a charge upon said land.''

Appellee calls attention to a number of authorities construing this statute, some of them holding that the purchaser is entitled to recover improvements irrespective of his belief in the integrity of his tax title and regardless of color of title as reflected by his deed.

We do not review the authorities construing this statute for the reason that they have no application to the facts in this case.

In the cases referred to by counsel, there was no question of fraud or agency involved. In the instant case, the appellee was the agent of the appellant to look after the property, rent it, and pay the taxes. He ascertained that the property had forfeited for the nonpayment of taxes, and he purchased it.

We said in a recent case: "Every one, whether designated agent, trustee, servant or what not, under contract or other legal obligation to represent and act for another in any particular business or line of business or for any valuable purpose must be loyal and faithful to the interests of such other person in respect to such business or purpose. He cannot lawfully serve or acquire any private interest of his own in opposition to that of his principal. 'This is a rule of common sense and honesty, as well as of law.' In 21 R. C. L. 825, it is also said: 'He may not use any information that he may have acquired by reason of his employment, either for the purpose of acquiring property or doing any other act which is in opposition to his principal's interest.' See also, *Houston Rice Co.* v. *Reeves,* 179 Ark. 700, 17 S. W. 2d 884; *Dudney* v. *Wilson,* 180 Ark. 416, 21 S. W. 2d 615, where the court quoted with approval from *Trice* v. *Comstock,* 121 F. 620, 61 L. R. A. 176, the following: 'Every agency creates a fiduciary relation, and every agent, however limited his authority, is disabled from using any information or advantage he acquired through his agency, either to acquire property or to do any other act which defeats or hinders the efforts of his principal to accomplish the purpose for which the agency was established.' See, also, 2 C. J. 692," and *Lybarger* v. *Lieblong,* 186 Ark. 913, 56 S. W. 2d 760.

In the instant case it was the duty of appellee to pay the taxes, and the land forfeited for nonpayment of taxes after appellant moved to Texas, and the appellee purchased from the state. He could not have acquired any interest in the land adverse to appellant's interest, but his purchase was necessarily for the benefit of the principal, and all that he would be entitled to would be to be reimbursed in the amount he paid for the title.

"Also, the agent will not be permitted to acquire for his own use or benefit outstanding claims or liens which are held against the principal's property, and he will not be allowed, where he is employed to compromise or settle claims against his principal, to purchase the claim involved for himself and enforce them against his principal. An agent found guilty of a breach of duty in this respect will be regarded as holding his newly-acquired interests as trustee for the principal, since all rights, title, or interests inure to the benefit of the principal, and the agent may be compelled to transfer them to the latter, and to account for all benefits and profits gained thereby." 3 C. J. S., p. 13, § 140.

In the absence of the principal's knowledge and consent, an agent in charge of lands or property of the principal cannot purchase and obtain a valid tax title to such land at tax sale. 3 C. J. S. p. 14, § 140.

An agent or trustee cannot purchase the property of his principal which has been confided to his care, and if he discovers a defect in the title of his principal, he cannot use his discovery to acquire title for himself. *Rogers* v. *Lockett*, 28 Ark. 290; *Huffman* v. *Henderson Co.*, 186 Ark. 792, 56 S. W. 2d 176; *Wright* v. *Davis*, 195 Ark. 292, 111 S. W. 2d 565; *Collins* v. *Rainey*, 42 Ark. 531.

The decree of the chancery court awarding the property in controversy to the appellant is affirmed. The appellee is entitled to the amount paid for the tax title, but this is offset by the use and benefit of the property, and therefore the decree awarding judgment for improvements is reversed, and the cause of action for improvements is dismissed.