**FARROW v. DERMOTT DRAINAGE DIST.**
**DERMOTT DRAINAGE DIST. v. FARROW.**

Nos. 12663, 12664.

Circuit Court of Appeals, Eighth Circuit.

Jan. 17, 1944.

Baucum Fulkerson, of No. Little Rock, Ark., and A. F. House, of Little Rock, Ark., for F. F. Farrow, as trustee.

P. A. Lasley of Little Rock, Ark., for Dermott Drainage Dist.

Before THOMAS and JOHNSEN, Circuit Judges, and MOORE, District Judge.

THOMAS, Circuit Judge.

This is a suit brought by F. F. Farrow, as trustee for bondholders, against Dermott Drainage District, a quasi public corporation of Arkansas, and its Board of Com-

missioners. The plaintiff demands judgment for $32,400 on past-due bonds of the District with interest, for foreclosure of the pledge and lien securing the bonds, and for costs and attorney fees. The defendants pleaded payment and sought by counterclaim to obtain a decree charging the holders of the bonds sued on for funds received from the District and misappropriated, and cancelling the bonds and the pledge and lien securing them.

Upon facts found and conclusions of law declared after trial, the lower court entered judgment against the District for $3,738.52, the balance found due on the bonds, and for $1,000 attorney's fee, and against the plaintiff for costs. The plaintiff appeals for failure of the court to grant the full amount claimed and from the judgment for costs, and the District appeals from the inclusion in the judgment against it of an item of $926.13 and from the allowance to plaintiff of an attorney's fee in the sum of $1,000.

 Elmer C. Smith and C. W. Diekroeger own the bonds sued upon and are the beneficiaries of the judgment. Since the suit calls for equitable relief the District may urge any equitable defenses which it may have against the beneficiaries. Stone v. White, 301 U.S. 532, 535, 536, 57 S.Ct. 851, 81 L.Ed. 1265.

As of March 1, 1915, the District issued and sold $190,000 of 6% bonds, payable to bearer, and maturing September 1, 1918, through 1935. The bonds were in denominations of $500 and $1,000 each, numbered serially from 1 to 323, inclusive, beginning with the earliest maturities.

The District having defaulted in the payment of accrued interest and the matured portion of its outstanding bonds, the holders of the bonds in September, 1929, organized a Bondholders' Protective Committee of three members. Under the terms of their agreement the bondholders transferred the legal title to and deposited their bonds with the Committee, receiving from the Committee certificates or receipts evidencing their respective deposits. Among other things the agreement provided:

"The interest of the depositors in the property and assets of this trust shall be in proportion to the principal of the bonds deposited hereunder. * * *

* * * * * * *

"Any member of the Committee and any firm or corporation of which he may be a member, director, officer, or stockholder and the depositary or its respective officers, trustees, directors or agents, may be or become pecuniarily interested in any property or matters which are or may become the subject of this agreement and may contract with the Committee or be a member or manager of any other Committee, association or syndicate which may contract with the Committee."

Smith, a Saint Louis bond dealer, was secretary of the Committee from the time it was organized until its dissolution on June 1, 1940. He was also a member of the Committee after March 21, 1938.

Continuously since April, 1934, Smith and Diekroeger were joint managers of the special service department of Albert Theis & Sons, receiving as compensation, salaries and a percentage of the profits of their department. Their duties were to represent bondholders' protective committees and to collect defaulted bonds and coupons. The Committee employed Albert Theis & Sons as its fiscal and managing agent for 10% of all amounts collected from the District after April, 1934.

On April 1, 1933, Carroll J. Brown, one of the Commissioners of the District, was appointed receiver of the District by an Arkansas state court. The receivership continued until November 9, 1939, when it was dissolved and the affairs of the District returned to the Commissioners. John Baxter was attorney for the receiver during Brown's continuance in office.

After the appointment of the receiver it was recognized that the financial situation of the District was serious. The taxpayers were neither paying their taxes nor redeeming their lands. Under these conditions the Committee agreed to accept $54,300 in full settlement of the outstanding bonds, but the District did not have this amount and was unable to borrow it.

On December 16, 1936, the Committee adopted the following resolution:

"Whereas, Dermott Drainage District of Ashley, Drew and Chico Counties, Arkansas has failed to obtain a commitment from the RFC to enable it to refinance its outstanding indebtedness on the basis of a cash payment of $54,300, and

"Whereas, said District desires to adopt a definite plan of liquidating its outstanding indebtedness,

"Now, Therefore, Be It Resolved that this Committee hereby approves a plan of

liquidation on the following terms and conditions, to-wit:

"Allow the District to settle accrued interest on the bonds up to March 1, 1936 at 50¢ on the dollar.

"The District to pay interest on the bonds from March 1, 1936 at the rate of 4% per annum and use the balance of funds to pay bonds at the face amount of the principal thereof.

"The Committee to pay and agrees to pay annually 4% on the approved settlement price of $550.00 per $1,000 C/D before using any funds to call for tenders of certificates.

"The Committee to use the $7,783.65 received in settlement of int. up to March 1, 1936 and all money received in the payment of bonds to call for tenders of C/D at a price not to exceed 55¢ on the dollar of the original par value of bonds represented by certificates and give the District Credit for all bonds purchased in this manner.

"All bonds purchased for the benefit of the District are to be held by the Committee as a guarantee for the faithful performance of the duties of the officers of the District. These bonds are not to be considered outstanding obligations of the District and are to be surrendered to the District when as and if all outstanding bonds are retired and interest paid thereon at the rate of 4% until paid. Otherwise, these bonds are to be returned to the assets of the Committee and considered outstanding obligations of the District.

"In subsequent years, the District is to first pay 4% interest on the outstanding bonds and the balance of the funds are to be applied on the principal. The Committee after allowing for interest on the C/D at 4% of the settlement price of $550.00 and after allowing for its expenses is to use the balance of funds to call for tenders at a maximum price to be determined by the Committee and the District is to be given credit for the bonds so purchased as in the first instance."

At the time the resolution was adopted the District had paid and retired bonds numbered 1 to 220, inclusive, aggregating $99,500 par value, and in addition had paid $15,370 which had been applied on the principal of the remaining bonds as follows: On bonds 220 to 253, inclusive, $370 on each $1,000 par value, leaving $630 unpaid; on bonds 254 to 271, inclusive, $270

on each $1,000 principal, leaving $730 unpaid; on bonds 272 to 290, inclusive, $50 on each $1,000 principal, leaving $950 unpaid. No payments had been made on the principal of bonds 291 to 323, inclusive.

On March 1, 1936, there were outstanding past-due bonds in the face amount of $90,500 on which there was unpaid $75,130 principal with accrued and delinquent interest in the amount of $15,777.30. To liquidate this indebtedness the receiver, and after him the Commissioners, accepted the plan proposed in the resolution of the Committee. The parties agree that the resolution then became a binding contract.

After the plan of liquidation embodied in the resolution had been agreed upon the District transmitted funds to the Committee from time to time to be applied according to its terms. The dispute arises out of the handling and application of these funds.

The plaintiff's appeal presents four questions: 1. What was the proper formula under the resolution of December 16, 1936, for retiring bonds purchased by the Committee on tenders? 2. Did the resolution of December 16, 1936, after its acceptance by the District create a fiduciary relation between the Committee and the District? 3. Was the resolution rescinded by mutual agreement in May, 1940? and 4. Did Smith and Dickroeger have a right, as successors of the Committee, to fix the tender price at 100%, or as owners to collect 100%, on the theory that the resolution had been rescinded?

1. *Purchasing and retiring bonds after December 16, 1936.*—Pursuant to the provisions of the resolution of December 16, 1936, the Committee made three calls for the purchase of certificates on tenders at not to exceed 55 cents on the dollar: on May 5, 1937; on March 21, 1938; and on November 27, 1939. On the first call certificates representing bonds of the face value of $48,000 were tendered, and certificates representing bonds of the face value of $25,500 were purchased at a cost of $12,843; on the second call $28,000 were tendered, and $6,000 were purchased for $2,876.75; and on the third call $35,000 were tendered and $16,500 were purchased for $7,913.50.

After each such purchase of certificates tendered the Committee, instead of setting aside for the benefit of the District identical bonds represented by the particular certificate-receipts purchased, withdrew bonds

with the lowest serial numbers. For example, as a result of the tender of May 5, 1937, bonds numbered from 221 to 257, inclusive, were selected. These bonds had all matured on September 1, 1928, and $370 had been paid on each $1,000 principal. The same system was adopted on each of the subsequent tenders. The result of this method of retiring the bonds purchased was that bonds on which there was an unpaid balance of only $16,065 were retired on the first call, $4,130 on the second call, and $12,560 on the third call. In other words, while $48,000 face value of the $90,500 of outstanding bonds were purchased, only $32,755 of the $75,130 of outstanding debt was liquidated, leaving $42,375 unpaid.

Following each call Smith, the secretary of the Committee, sent to the District cancelled bonds on which the balance due aggregated $15,375. He represented that he held in escrow under the resolution bonds for which the District was entitled to credit, the unpaid balance of which was $17,380, making the total of $32,755.

The District contended that the method adopted by the Committee of selecting the bonds for credit was arbitrary and prejudicial to its rights. The certificates are not set out in the record, but Smith, secretary of the Committee, testified that "The certificates all bore endorsements to the effect that they [the bonds] were entitled to be credited with an equal proportionate amount of liquidating dividends theretofore paid. * * * Each depositor had an interest in those bonds in proportion to the par value of their certificates to the bonds outstanding. When we purchased a certificate of the original par value of $5,000, that certificate represented a definite fixed proportion of $75,130. We did not retire that much indebtedness." Smith's testimony is corroborated by the provision of the bondholders' agreement, quoted supra.

Upon the basis thus adopted by the Committee the District contends that to every bond outstanding at the time the resolution of December 16, 1936, was adopted and agreed upon, for the purpose of applying the plan of liquidation, there should be attributed an equal proportion of the total unpaid balance of $75,130, or $830.166 per $1,000 par value of the bonds. Applying this formula the unpaid balance on bonds of the face value of $48,000 is $39,847.97. Subtracting from $39,847.97 the sum of $15,375 leaves a balance of $24,472.97 instead of only $17,380. The result of this method of calculation is that the Committee should have set aside and held in escrow for the credit of the District on the three tenders bonds on which there was a balance due of $24,472.97, or $7,092.97 more than was set aside.

The trial court adopted the theory and contention of the District. Upon the record and the issue submitted it can not be found that the court erred. Under the provisions of the resolution the Committee was required to give the District credit on each tender for the "bonds represented by certificates" purchased and surrendered by the certificate holders. For the Committee to purchase a certificate representing a $1,000 bond on which no payments had been endorsed and to give the District credit for a bond on which a payment of $370 had been made is contrary to the agreement of the parties and prejudicial to the rights of the District.

█ The court decided the issue presented by the pleadings upon the evidence submitted. The result is fair to the owners of the certificates. The formula adopted by the Committee was neither equitable nor in accordance with the agreement embodied in the resolution. Although a certificate representing a bond on which no payment had been made was worth no more to its owner than a certificate representing a bond on which a payment of $370 had been endorsed, the method of retiring bonds followed by the Committee left until last those on which no payments had been made. Such plan made possible the attempt of Smith and Diekroeger, by purchasing the bonds on which little or no payments had been endorsed, to force the District to pay many thousands of dollars more in settlement of its debts than the plan of liquidation agreed upon contemplated. It was not a good faith execution of the terms of the resolution, and a court of equity will not aid the parties who conceived the plan to reap an advantage over the taxpayers by it.

2. *Was the Committee responsible as a fiduciary?*—This question arises out of certain credits allowed by the court against the plaintiff's claim. Included in amounts remitted to the Committee by the District and paid out for certificates tendered was the sum of $8,620.93 consisting of profits made on speculation in certificates by the following parties: Carroll J. Brown, $3,979; John Baxter, $2,566; Albert Theis & Sons, Smith and Diekroeger, $1,776.25; and J. C.

Wienecke, an acquaintance of Smith, $299.-68.

At the time Brown and Baxter purchased and later tendered and sold certificates to the Committee they occupied the positions of receiver for the District and attorney for the receiver, respectively. At that time Smith, secretary of the Committee, and Diekroeger represented the fiscal agent for the Committee. Smith knew Brown and Baxter and knew they were, although receiver and attorney for the District, speculating in certificates. Smith also purchased certificates for his firm, Albert Theis & Sons, and for their employees.

The court held that the District was entitled to all the profits made in these transactions. The District seeks to sustain this holding on the theory that as a result of its acceptance of the plan of liquidation proposed by the Committee in the resolution of December 16, 1936, the Committee stood in the relation of a fiduciary to it. The plaintiff contends that the resolution did not alter the creditor-debtor relation existing between the Committee and the District prior to its adoption.

■ We think the finding of the court on this point is supported by the facts and the law. The Committee was representing the holders of $90,500 principal value of past-due and delinquent bonds. The R.F.C. had refused to loan the District more than about one-third of the face value of the bonds for the purpose of settling with the bondholders. The bonds were selling on the market at 19 and 20 cents on the dollar. With the consent and approval of the bondholders the Committee proposed the contract embodied in the December, 1936, resolution. When money was transmitted to the Committee by the District, the Committee was obligated by the contract to apply it first to payment of the expenses of the Committee, second to the payment of 4% interest on $550 of each $1,000 bond, and the balance to the purchase of bonds at the lowest price available under the call and tender plan contained in the resolution. The application of the fund remitted by the District was for the benefit of the District. Smith so construed the contract. He testified: "* * * by the terms of the resolution the district was to get the benefit of tenders." The duty of the Committee and its fiscal agent was to apply every remittance received from the District in good faith to the fulfillment of the agreement. Every such remittance constituted a trust fund in the hands of the Committee. Libby v. Hopkins, 104 U.S. 303, 26 L.Ed. 769.

Black's Law Dictionary defines fiduciary relation as "A relation subsisting between two persons in regard to a business, contract, or piece of property, * * * of such a character that each must repose trust and confidence in the other and must exercise a corresponding degree of fairness and good faith. Out of such a relation, the law raises the rule that neither party may * * * take selfish advantage of his trust, or deal with the subject-matter of the trust in such a way as to benefit himself or prejudice the other except in the exercise of the utmost good faith and with the full knowledge and consent of that other." Such a relation existed between the District and the Committee, and by reason of such relation neither the members of the Committee nor its agents employed in connection with the liquidation plan could, without the knowledge and consent of the District, become interested in making a profit on the bonds at the expense of the District from the money remitted by the District for the purpose of liquidating bonds at the lowest possible price. The tender system provided for in the resolution could not be used as a device by the common representatives of the certificate holders and the District to enrich themselves and their friends at the expense of both the certificate holders and the District by buying certificates at a low price and selling them to the Committee at a profit without the consent of the District. Such a course of conduct is nothing less than conversion of a trust fund. Both the Committee and its agents, Smith and Diekroeger, are accountable to the District for the profits made by Smith, by Albert Theis & Sons and by its officers and employees, Diekroeger and Wienecke. Cf. 1 Restatement, Law of Trusts, § 2, Comment b, page 7; Libby v. Hopkins, 104 U.S. 303, 26 L.Ed. 769; Trice v. Comstock, 8 Cir., 121 F. 620, 61 L.R.A. 176; Rossman v. Blunt, 6 Cir., 104 F.2d 877; Rorebeck v. Van Eaton, 90 Iowa 82, 57 N.W. 694; Thomas v. Whitney, 186 Ill. 225, 57 N.E. 808, 810; Dick v. Albers, 243 Ill. 231, 90 N.E. 683, 685, 134 Am.St.Rep. 369; Harris v. Gilmore, 197 Ark. 641, 124 S.W.2d 810; Spokane Security Finance Corp. v. Deposit Co., 182 Wash. 23, 44 P.2d 1036; National Citizens' Bank v. Ertz, 83 Minn.

**806**

12, 85 N.W. 821, 53 L.R.A. 174, 85 Am.St. Rep. 438; Wimberley v. Bank of Portia, 158 Ark. 413, 250 S.W. 334; Albright v. Taylor, 185 Ark. 401, 47 S.W.2d 579.

■ That Brown and Baxter could not speculate in the obligations of the District with its funds, as the record shows they did, and at its expense is too clear for argument. Cf. Fidelity & Deposit Co. v. Cowan, 184 Ark. 75, 41 S.W.2d 748; Drainage District No. 7 v. Citizens Bank, Ark., 205 Ark. 435, 170 S.W.2d 60, 62. Since Smith, and through him the Committee, had full knowledge of the conduct of Brown and Baxter, and, in fact, aided them in obtaining the money belonging to the District, he is liable for their conversion and breach of trust. Cf. 2 Restatement, Law of Trusts, § 326, page 972; Blanton v. First Nat. Bank, 136 Ark. 441, 206 S.W. 745.

The court correctly held Smith and Diekroeger liable to the District for the loss of $8,620.93. The Committee acted in a fiduciary capacity in handling and applying funds remitted by the District.

■ 3. *Was the resolution rescinded in May, 1940?*—The plaintiff contends that the resolution was rescinded by mutual consent of the Committee and the District in 1940. The court found that it was not so rescinded. The evidence supports the finding of the court. At that time the resolution was modified in respect of the rate of interest to be paid thereafter; but no member of the District Commissioners, except Brown alone, knew that the Committee was dissolved or that it was intended to rescind the resolution. Thereafter funds were remitted by check to the Committee and to Smith as secretary; those checks were endorsed and cashed; and Smith corresponded with the Commissioners on the Committee's letterheads and as its secretary. Clearly there could be no rescission without the knowledge and consent of both parties.

In this connection the plaintiff contends that the court erred in refusing to permit Smith to testify that the Commissioners had orally agreed in May, 1940, that the resolution should be rescinded. The proffered evidence was denied on the ground that there was an explicit written contract between the parties and that its terms could not be orally disputed or varied. The contract was embodied in a letter from Smith to the Commissioners of the District and a resolution adopted by the Commissioners. The letter under date of May 28, 1940, accompanied the $17,380 of bonds held in escrow by the Committee. Addressed to Brown, it stated:

"These bonds are being surrendered under conditions that the remaining outstanding bonds will again bear interest 6% from March 1, 1940. There remains outstanding $39,525 principal amount of bonds and if there are any funds available I suggest that they be applied in order to save interest.

"I suggest that you have a meeting of your Board of Commissioners accepting the conditions under which these bonds are being surrendered to the District."

Upon receipt of the letter a special meeting of the Commissioners was called at which the following resolution was adopted: "Be it resolved that the outstanding bonds in the sum of $17,380.00 that are now held in escrow by Bond Holders Protective Committee, under agreement with former receiver of district be surrendered and cancelled, and that from March 1st, 1940 the balance of bonds outstanding bear interest at the rate of 6% as was first issued."

■ The letter and the resolution clearly show that the parties proposed to modify, not to rescind, the resolution of December 16, 1936. Had they intended to rescind that contract entirely there would have been no necessity for a separate resolution modifying the interest rates. The 6% would have been automatically restored on the unliquidated bonds. Oral testimony of Smith, who was the principal actor in the May, 1940, conference with the Commissioners and a vitally interested witness, inconsistent with these recorded facts, could have had little weight, had it been admitted. Since it would have tended to vary and contradict a written contract which limits and defines the legal obligation sued upon, the court did not err in rejecting the testimony. 32 C.J.S., Evidence, § 901, p. 816.

The significance of the question of the rescission of the contract is obvious. After the third call for tenders of certificates on November 27, 1939, had been exercised, pursuant to the terms of the resolution of December 16, 1936, there remained outstanding certificates representing $42,500 principal of bonds on which payments in the amount of $545 only were endorsed as shown by the records kept by the Committee. At that time there remained in the

807

hands of the Committee $242.36, and on March 8, 1940, the District remitted the further amount of $4,545, making a total sum of $4,787.36 available for use under the contract. At this or some prior time Smith and Diekroeger, representing the fiscal agent of the Committee, conceived the idea of purchasing the outstanding bonds from the Committee. On May 7, 1940, they offered the Committee 57 cents on the dollar for the remaining bonds. After obtaining the consent of the certificate holders, the Committee, without calling for tenders, sold and delivered the bonds to Smith and Diekroeger on May 28, 1940. With the $4,787.36 on hand and the sum of $22,529.25 received from Smith and Diekroeger the Committee paid interest on the outstanding bonds, retired three $1,000 bonds, paid expenses including $1,126.45 to Albert Theis & Sons as a fee for the sale of the bonds, and distributed $603.50 per $1,000 principal to the holders of certificates representing $42,500 of principal of bonds. The Committee acting through Smith claimed that it delivered $39,525 of bonds to Smith and Diekroeger at 57 cents on the dollar. Referring to the sale, Smith testified: "I did not tell the commissioners that the money ($4545) remitted on March 8th was to be used, as I did not think it was their money. I was a member of the Committee, and I was buying the bonds."

After the sale was consummated the Committee was dissolved; but the District, ignorant of its non-existence, transmitted further funds in the amount of $9,261.37 which Smith received, and he and Diekroeger retained.

4. *Did Smith and Diekroeger after the purchase of the bonds have a right as owners to collect 100% of the unpaid amount of the outstanding bonds?*—Smith testified that after he and Diekroeger purchased the remaining outstanding bonds in May, 1940, they regarded themselves as successors of the Committee. Plaintiff's argument at this point is in the alternative. Counsel argue that as a Committee Smith and Diekroeger could, under the provisions of the resolution, "Call for tenders at a maximum price" of 100%; or, as owners of the bonds, they could refuse to tender them for less than 100%. Therefore, it is concluded that the District can not complain. The fact remains, however, that no tenders were called for after November, 1939, while the contract (resolution) required the Commit-

tee to apply all funds remitted by the District through the call and tender system.

The complete answer to this question lies deeper than plaintiff's argument would indicate. The answer depends upon the soundness of the following findings and conclusions of the court:

1. That since all of the bonds were in default when the resolution of December 16, 1936, was adopted and accepted, Smith and Diekroeger took them subject to all defenses to which they would have been subject in the hands of the Committee.

2. That the maximum liability of the District on outstanding bonds, after the resolution was adopted and accepted, was the amount which the Committee might pay the certificate holders for their certificates in accordance with the plan provided in the resolution.

3. That the sale and delivery of the bonds by the Committee to Smith and Diekroeger was a breach of the contract.

4. That Smith and Diekroeger were legally incompetent to purchase the bonds from the Committee at the time and under the circumstances.

■ None of these findings and conclusions is clearly erroneous. The first is merely a statement of the applicable law of negotiable instruments, the correctness of which is not disputed. If the word "maximum" in the second finding be given its proper meaning, this statement is also true. Plaintiff argues that the liability of the District was the full unpaid amount of the outstanding bonds. The debtor and its creditors, the Committee representing the bondholders, however, had a right to do so, and did, by what both parties agree is a valid binding contract, modify and limit that liability.

■ That the third proposition is true is equally certain. Smith was a member of the Committee. The duty of the Committee under the resolution was, in the interest of the District and for its benefit, to purchase certificates at the lowest prices at which they were available. For Smith, acting in a fiduciary position, to sell the bonds to himself was clearly a breach of the contract.

■ The court's fourth proposition is also sound. Smith and Diekroeger represented Albert Theis & Sons, the fiscal agent for the Committee, which received its compensation from the funds of the District.

808

They acted as agents to effect the sale for which they charged a fee of $1,126.45. They were legally incompetent thus to act adversely to the interests of the District. At this point plaintiff relies upon the provision of the bondholders' agreement, supra, to the effect that any member of the Committee, or firm of which he may be a member or officer, may contract with the Committee and become pecuniarily interested in the subject matter of the agreement. Whatever the proper construction of that agreement may be, it is not binding on the District. Paragraph 12 of the bondholders' agreement provided that "This agreement shall be construed strictly as an agreement between the parties hereto * * * and it is agreed that no other person * * * shall have any rights hereunder." The District was not a party to that contract, and to the extent that Smith and Diekroeger were bound to act in good faith with the District, it does not diminish their responsibility.

■ The plaintiff contends further that Smith and Diekroeger could be legally incompetent to purchase the bonds in May, 1940, only on the theory that they were fiduciaries, in which case the District would be entitled to recover only their profits. Since they did not sell the bonds they made no profits. Because we hold that the court did not err in holding that they were fiduciaries and because the court has cancelled the bonds, Smith and Diekroeger can not complain.

Finally the plaintiff complains that the court erred in taxing costs to him. This complaint is based upon the denial of the existence of a fiduciary relationship between the Committee and the District. As we have sustained the court's finding upon this point, the contention requires no discussion.

■ Turning to the cross-appeal, we think the court erred in charging the District with $926.13 expense. The court found that had there been paid to the Committee while it was in existence the $9,261.-37 remitted by the District after the dissolution of the Committee in May, 1940, and received and kept by Smith and Diekroeger, 10% thereof, or $926.13, would have been paid to Albert Theis & Sons for their services. For this reason the amount, was charged to the District and Smith and Diekroeger were given judgment therefor. The District was required to pay expenses of the Committee actually incurred for services actually rendered. This expense was not incurred and no services representing the charge were ever rendered. It should not be charged against the District. The 10% of remittances agreed to be paid to Albert Theis & Sons was only a measure of the value of services to be rendered and when no service was rendered no payment was due.

■ The District also appealed from the allowance to the plaintiff of an attorney fee in the sum of $1,000. The District concedes that the amount is reasonable but that it is not equitable to allow any fee whatever. The complaint alleged that the mortgage securing the bonds provided that the District would compensate counsel for the trustee, if it were necessary to employ counsel to act for the benefit of the bondholders. The court held that "Equity requires that plaintiff recover" an attorney fee from the defendant. If it may fairly be said that this suit were necessary, an equity exists in favor of the plaintiff. We find nothing to indicate that had Smith and Diekroeger in good faith, representing the fiscal agent for the Committee, proceeded with the performance of the contract (resolution) instead of purchasing the bonds for the obvious purpose of making a large profit, any litigation would have been necessary. Moreover, the allowance of an attorney fee for the benefit of Smith and Diekroeger is inconsistent with the findings that the sale of the bonds to them was a breach of the contract and that they were incompetent to purchase them. We find no equitable basis in the record for the allowance of any attorney fee to the plaintiff.

Other minor contentions of the parties have been carefully reviewed and considered in the light of the record, and we find that they are without merit. No useful purpose would be served by extending this opinion with further discussion.

The result is that the judgment is modified by deducting from the amount allowed the plaintiff the sum of $926.13 and by reversing the allowance of a $1,000 attorney fee in favor of the trustee; and, as so modified, the judgment is affirmed.