Ray B. WOODBURY, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. No. 9403.

United States District Court
D. Oregon.

Feb. 8, 1961.

King, Miller, Anderson, Nash & Yerke, Norman J. Wiener, Paul R. Meyer, Portland, Or., for plaintiff.

C. E. Luckey, U. S. Atty., Portland, Or., for defendant.

KILKENNY, District Judge.

Plaintiff claims the right to recover $853,676.82 from defendant under the Federal Tort Claims Act (Title 28 U.S.C.A. §§ 1346(b) and 2671 through 2680). The claim grows out of the plaintiff's interest in a housing development at Kodiak, Alaska, which development involved the plaintiff and several governmental agencies. In order to fully understand the issues, it is necessary to have a clear picture of the agencies involved.

Housing and Home Finance Agency and Housing and Home Finance Administrator (hereinafter called HHFA) was created by the Reorganization Plan No. 3 of 1947 (61 Stat. 954, 5 U.S.C.A. following section 133y–16). Under this plan the various functions of the government relating to housing were consolidated within HHFA. At present, HHFA consists of five constituent agencies or units dealing with various aspects of the national housing program:

(1) Federal Housing Administration (hereinafter referred to as "FHA"), an agency created by the President pursuant to authorization by Congress, which engages in programs of mortgage insurance.

(2) Federal National Mortgage Association, a statutory corporation (hereinafter referred to as "FNMA"), which provides a secondary market for the purchase and discounting of mortgages.

(3) Urban Renewal Administration, an agency concerned with programs of urban renewal and slum clearance.

(4) Public Housing Administration, an agency which deals with programs relating to federally financed housing.

(5) Community Facilities Administration (hereinafter referred to as "CFA"), an agency which engages in a variety of programs relating to housing and community facilities not covered by the other

four constituent agencies. CFA was formerly called the Community Facilities and Special Operations branch (CF&SO), but the change in its name did not affect its functions or authority. Among the programs administered by CFA were those related to Alaska housing and prefabricated housing.

The agencies related to Urban Renewal and Public Housing had no connection with the Aleutian Homes project.

The Housing and Home Finance Administrator (hereinafter referred to as "Administrator") is the head of HHFA and is responsible for the general supervision and coordination of the statutory functions of the constituent agencies of HHFA.

The original interest of the government in prefabricated housing was contained in the Veterans Emergency Housing Act of 1946, 60 Stat. 207, Chap. 268, § 12(a). The government functions relating to this program of prefabricated housing were, at that time, vested in the Reconstruction Finance Corporation, a corporation (hereinafter referred to as "RFC"). The powers of RFC which were applicable to its functions in the field of prefabricated housing were set out in 15 U.S.C.A. § 603. The powers and functions of RFC which related to prefabricated housing were transferred to HHFA by Reorganization Plan No. 23 of 1950 (64 Stat. 1279, 5 U.S.C.A. following section 133z–15), as limited by statute. By Title 12 U.S.C.A. § 1723d the functions of HHFA under Section 2 of Reorganization Plan No. 22 of 1950, 5 U.S.C.A. following section 133z–15 were transferred to FNMA August 2, 1954.

Provisions for the making of loans for prefabricated housing were added as § 102a of the Housing Act of 1948 (62 Stat. 1268) by the Critical Defense Housing Areas Act of 1951 (65 Stat. 293, 12 U.S.C.A. § 1701g–1).

The powers given the Housing and Home Finance Administrator with respect to prefabricated housing, set forth in 12 U.S.C.A. § 1701g-2, include the following:

(A) All the powers and functions transferred to him by Reorganization Plan No. 23 of 1950.

(B) The powers, functions and duties set forth in 12 U.S.C.A. § 1749a, except subsection (c) (2) thereof.

(C) The power to "take any and all actions determined by him to be necessary or desirable in making, servicing, compromising, modifying, liquidating, or otherwise dealing with or realizing on loans thereunder. Such powers, functions, and duties may be exercised in the several States, the District of Columbia, and the Territories and possessions of the United States."

Included in the powers of the Administrator, set forth in § 1749a to which reference is made in § 1701g-2(1) as being applicable to the prefabricated housing program, are the following:

"(3) sue or be sued;

"(4) foreclose on any property or commence any action to protect or enforce any right conferred upon him by any law, contract, or other agreement, and bid for and purchase at any foreclosure or any other sale any property in connection with which he has made a loan pursuant to this subchapter. In the event of any such acquisition, the Administrator may, notwithstanding any other provision of law relating to the acquisition, handling, or disposal of real property by the United States, complete, administer, remodel and convert, dispose of, lease and otherwise deal with, such property: Provided, That any such acquisition of real property shall not deprive any State or political subdivision thereof of its civil or criminal jurisdiction in and over such property or impair the civil rights under the State or local laws of the inhabitants on such property;

"(5) enter into agreements to pay annual sums in lieu of taxes to any State or local taxing authority with respect to any real property so acquired or owned;

"(6) sell or exchange at public or private sale, or lease, real or personal property, and sell or exchange any securities or obligations upon such terms as he may fix;

"(7) obtain insurance against loss in connection with property and other assets held;

"(8) subject to the specific limitations in this subchapter, consent to the modification, with respect to rate of interest, time of payment of any installment of principal or interest, security, or any other term of any contract or agreement to which he is a party or which has been transferred to him pursuant to this subchapter; and;

"(9) include in any contract or instrument made pursuant to this subchapter such other covenants, conditions, or provisions as he may deem necessary to assure that the purposes of this subchapter will be achieved."

The Independent Offices Appropriation Act of 1955 passed on June 24, 1954, as Ch. 359, 68 Stat. 272 (83rd Cong.2d Sess., Public Law 428) established as of July 1, 1954, a revolving fund with which the Administrator could account for all assets and liabilities in connection with various programs, including:

" * * * functions transferred under Reorganization Plan No. 23 of 1950 (5 U.S.C. 133z-15, note), or authorized under Sections 102, 102a, 102b, and 102c of the Housing Act of 1948, as amended (12 U.S.C. 1701 g–1701g–3 [Prefabricated Housing Program]); * * * notes or other obligations purchased pursuant to the Alaska Housing Act, as amended (48 U.S.C. 484(a)); * * *"
It was further provided:

"That said fund shall be available for all necessary expenses (including administrative expenses) in connection with the liquidation of the programs carried out pursuant to the foregoing provisions of law, including operation, maintenance, im-

provement, or disposition of facilities, and for disbursements pursuant to outstanding commitments against moneys herein authorized to be credited to said fund, repayment of obligations to the Treasury, and refinancing and refunding operations on existing loans * * *."

After non-payment of its note, the Aleutian Homes, Inc. project was included in the liquidating program administered by HHFA under the revolving fund established by this Act.

FHA was established in 1934 with powers as codified in 12 U.S.C.A. § 1702. It was transferred as a constituent agency to HHFA by Reorganization Plan No. 3 of 1947 (61 Stat. 954, 5 U.S.C.A. following section 133y–16). The powers to insure conventional mortgages on individual houses are contained in Title II, Section 203, of the National Housing Act of 1934 (48 Stat. 1248, Chapter 847, 12 U.S.C.A. § 1709). That section was amended by the Housing Act of 1954 (68 Stat. 591) to change the value ratio of loans which FHA is authorized to insure thereunder.

Under the provisions of the Alaska Housing Act, FHA was given authority to insure mortgages in Alaska in a dollar amount up to 50 percent higher than its authority with respect to mortgages on property located in the United States. Further it gave FHA authority to insure mortgages in Alaska without the requirement, applicable to housing in the states, that the commissioner find the project to be economically sound or an acceptable risk (63 Stat. 57, 65 Stat. 315, 12 U.S.C.A. § 1715d).

The creation of FNMA and the establishment of its powers is set out in 12 U.S.C.A. §§ 1716 through 1723d.

FNMA was transferred from the jurisdiction of RFC to HHFA to be "administered subject to the direction and control" of HHFA by Reorganization Plan No. 22 of 1950 (64 Stat. 1277, 5 U.S.C.A. following section 133z–15, as limited by statute. By Title 12 U.S.C.A. § 1723d the functions of HHFA under Section 2 of Reorganization Plan No. 22 of 1950 were transferred to FNMA August 2, 1954.

Likewise, it is necessary to know the names of the non-Federal government agencies and private organizations involved or in some way connected. They are:

A. *Alaska Housing Authority.* Agency of the Territory of Alaska concerned with housing problems in Alaska.

B. *City of Kodiak, Alaska.* The city through its officials, principally Mayor Lee C. Bettinger, took active interest in promoting a housing project for the City under private sponsors, and provided tax concessions for streets and other support for the project.

C. *Hubbell and Waller.* An engineering firm cooperating with the City for soil tests, street layout, etc.

D. *Ray Lewis and Associates.* A firm which negotiated with the City with view to sponsoring construction of project.

E. *Pacific Structures, Inc.* A firm in Portland, Oregon in which R. B. Woodbury and others were interested which planned to produce prefabricated houses.

F. *Aleutian Homes, Inc.* An Oregon corporation formed by R. B. Woodbury as President and principal stockholder to sponsor the Aleutian Homes project and become the owner thereof.

G. *Brice Mortgage Co. and Brice Realty Co.* Portland, Oregon mortgage brokers and realty firms. Brice Mortgage Co. agreed with Aleutian Homes, Inc. to arrange permanent financing for the project as mortgagee under a proposed loan for FHA insured mortgages and sale of the mortgages to FNMA. Brice applied for and received commitments from FHA to insure and FNMA to purchase the mortgages on stated conditions.

H. *Kodiak Construction Co.* An Oregon corporation organized with R. B. Woodbury as President for the purpose of being the General Contractor for the construction of the project.

I. *Pacific-Alaska Contractors, Inc.* A Washington corporation which had a sub-

contract from Kodiak Construction Co. for site preparation and foundations.

J.  *Carlton Lumber Co.*  A firm owned by A. B. Carlton which had a sub-contract from Kodiak to furnish the prefabricated house packages.

K.  *Leo S. Wynans Co., Inc.*  An Oregon corporation having a sub-contract from Kodiak to erect the houses on-site.

L.  *Coastwise Steamship Lines.*  Had agreement to transport houses from Portland, Oregon, to Kodiak, Alaska.

M.  *North Pacific Supply Co.*  A partnership at Portland, Oregon in which R. B. Woodbury, Fred Miller and Jack Crawford were partners, as electrical equipment wholesalers.

N.  *Columbia Supply Co.*  A partnership at Swan Island, Portland, Oregon composed of R. B. Woodbury and Lucille Woodbury, his wife.

O.  *Smith & McMenamin.*  A Portland, Oregon accounting firm employed by Woodbury as accountants on behalf of Columbia Supply Co., Aleutian Homes, Inc., and Kodiak Construction Co.

P.  *General Casualty Co.*  A bonding company providing performance bond as surety for general contract performance by Kodiak Construction Co.

Q.  *United States Fidelity & Guaranty Co.*  A bonding company providing performance bond as surety for site improvement contract of Pacific-Alaska Contractors, Inc.

R.  *United National Indemnity Co. and The Fidelity & Casualty Co. of New York.*  Bonding companies providing performance bond as sureties on the house package contract of Alex B. Carlton.

S.  *United Pacific Insurance Co.* Bonding company providing performance bond for construction contract of Leo S. Wynans, Inc.

Commencing in 1949, the possibility of securing additional housing for naval and civilian personnel connected with the Kodiak Naval Base in Alaska was discussed among Navy officials, officials of the Alaska Housing Authority, officials of the City of Kodiak and officials of FHA.

The possibility of securing housing under the Wherry Act (Title VIII of the National Housing Act, 12 U.S.C.A. § 1748 et seq. as amended) was considered and rejected and studies were then made with respect to the possibility of construction of an off-base project of some 350 to 400 houses using conventional FHA assistance under Title II, Section 203, of the National Housing Act, as amended.

During 1950–1951, arrangements were made to secure, as a site for this project, certain land belonging to the federal government under the control of the Bureau of Land Management of the Department of Interior.  Arrangements were made to transfer this land to the Alaska Housing Authority for reconveyance to the City of Kodiak for use for a project to be built by a sponsor selected by the City of Kodiak.  Subsequently, in accordance with law, the Alaska Housing Authority conveyed the land directly to the approved sponsor.  It was determined that the City of Kodiak would provide streets, the city and Department of Interior through Alaska Public Works would provide water and sewer facilities and schools and the local REA would provide power.  During 1951, the City of Kodiak received a commitment from the Alaska Public Works program for money to construct the sewer and water facilities in connection with the proposed project.

During 1950 and 1951 considerable surveying of the site and engineering was carried on on behalf of the City of Kodiak and a Raymond Lewis of Los Angeles who was a proposed sponsor for the project.  In late 1951, Mr. Lewis abandoned interest in sponsorship of the proposed project.

During 1951, plaintiff became interested in the promotion of a house panel invented by an architect, S. C. Horsley. In late 1951, plaintiff financed a trip by Horsley, R. A. Blanchard and G. K. Gosling to Alaska to investigate the possibility of selling the Horsley panel for use in houses in Alaska.  In the course of this promotion, Lee C. Bettinger, the Mayor of Kodiak, was contacted by Gos-

ling and commenced to interest plaintiff to become sponsor of the proposed project in the place of Raymond Lewis.

In February 1952, Aleutian Homes, Inc., was incorporated under the laws of the state of Oregon and in February or March 1952, the City of Kodiak approved Aleutian Homes, Inc., as the sponsor of the proposed housing project. Thereafter, the Alaska Housing Authority conveyed the land selected for the site to Aleutian Homes, Inc.

The proposed project was intended to be financed under the provisions of Title II, Section 203, of the National Housing Act, as amended. Under this program, a private mortgage agency takes out individual long-term mortgages on each house included in the project. With respect to the Kodiak project, Brice Mortgage Company was selected to act as the permanent mortgagee.

In order to enable Brice Mortgage Company to sell the mortgages which it intended to obtain on each of the houses in the project, it was necessary for Brice Mortgage Company to obtain a commitment from FHA to insure said mortgages. In accordance with FHA requirements with respect to the insurance of a project located in Kodiak, Alaska, the Secretary of Navy in 1951, with respect to Raymond Lewis and again in 1952 with respect to Aleutian Homes, Inc. certified to FHA (1) the critical urgent need of the Navy for 385 family units for use by military and civilian personnel at the Kodiak Naval Base, (2) the permanency of the Kodiak Naval Base, and (3) the ability of such military and civilian personnel to pay rentals for such units in the amount of $100, $130 and $150 for small two, large two and three bedroom units, including garage and kitchen equipment. In 1952, FHA appraised the value of a 344 unit project at $5,904,250 and in April 1952, issued for a stated period its conditional commitment to Brice Mortgage Company to insure long-range individual mortgages on each home in a total amount of $4,706,400, which amount was based on 80 percent of the FHA appraised value.

Also in 1952, FNMA issued its commitment to Brice Mortgage Company to purchase at par the individual long-range mortgages as they were obtained by Brice Mortgage Company and insured by FHA.

The $4,706,400 to be received from the long-term financing was to be used by Aleutian Homes, Inc., for (1) repayment of the construction loan from HHFA, $4,230,900; (2) payment of costs of taking out the permanent individual mortgages; and (3) any balance remaining as capital.

During 1952, Aleutian Homes, Inc., and Brice Mortgage Company found it impossible to secure from private sources the financing required for the construction of the project prior to the obtaining of the long-range financing as set forth above, and sought assistance from HHFA. In said year, negotiations were had between Brice Mortgage Company, acting on behalf of Aleutian Homes, Inc., and the Community Facilities and Special Operations Branch of HHFA for the purpose of securing an interim loan for construction purposes. A final application was made by Aleutian Homes, Inc. late in 1952 and approved in January 1953. This interim construction loan by HHFA was in the sum of $4,230,900, which constituted 90 percent of the amount of the FHA and FNMA commitments with respect to the permanent long-range financing, the application indicating the difference between the projected costs and the loan amount applied for would be provided for by the Sponsor, Aleutian Homes, Inc. The loan was authorized by a Loan Authorization signed by the Administrator, and carried into effect by documents required by a Building Loan Agreement, including a guaranty of the Loan Agreement and the guaranty of the construction contract by R. B. Woodbury, and a promissory note and deed of trust. Procedures for disbursement under the loan were provided for in a Loan and Disbursement Agreement executed by R. B. Woodbury as President, Aleutian Homes, Inc., April 27, 1953. The construction contracts and

stock of Aleutian Homes, Inc. were assigned to the Administrator. A Standby Agreement was executed by R. B. Woodbury, President, Aleutian Homes, Inc., and R. B. Woodbury, individually. Performance bonds run to Aleutian Homes, Inc. and the Administrator.

Contractual arrangements for the construction of the project under the interim loan from HHFA were signed in Seattle, Washington, on April 27, 1953. In general they provided as follows: Aleutian Homes, Inc., as the owner entered into a "general contract" with Kodiak Construction Co. for the construction of the housing project for the payment of the sum of $4,230,900 (the total maximum amount of the HHFA loan). Kodiak Construction Co., as general contractor, in turn contracted with three subcontractors, plus a freight company, the total payment under which subcontracts, plus freight, similarly equaled the sum of $4,230,900 (the maximum total amount of the HHFA loan). These subcontracts were as follows:

1. A "supply contract" entered into with Alex B. Carlton, doing business as Carlton Lumber Company, for the purchase of the prefabricated housing packages.

2. A "site construction contract" entered into with Pacific Alaska Contractors, Inc., for preparation of the site.

3. A "Construction contract" entered into with Leo S. Wynans Co., Inc., for the erection of the prefabricated houses on the prepared sites.

4. A contract with Coastwise Line for the transportation of prefabricated house packages and other materials from Portland, Oregon, to Kodiak, Alaska.

During the summer of 1953, certain difficulties arose in the preparation of the site and a controversy developed between Kodiak Construction Co., speaking through Leo S. Wynans, its agent, and Pacific Alaska Contractors, Inc. At the time of this controversy Pacific Alaska Contractors, Inc. ceased further work on the site preparation and Kodiak Construction Co., under the direction of Wynans, proceeded to furnish labor and materials required under the site construction contract.

In October and November, 1953, financial difficulties arose in connection with the construction of the project, and, on November 6, 1953, Pacific Alaska Contractors, Inc., filed a claim of lien against the project for the sum of $150,504.43. Thereupon, construction came to a standstill with the project approximately 75 percent completed.

When construction came to a standstill in the late fall of 1953, several possibilities of action were considered. These included foreclosure, completion of the project by the surety companies, demand on Ray B. Woodbury for performance, introduction of additional money in the project in conjunction with Aleutian Homes, Inc., or in substitution of Aleutian Homes, Inc. sponsorship, or completion of the project based upon a completion agreement. In November 1953 demand was made on Ray B. Woodbury under his guarantee. Woodbury failed to comply with the demand. In January, 1954, a completion agreement [1] was formulated in substantially the form in which it became effective on April 23, 1954. The period from the end of January through April 23, 1954, was devoted to securing the necessary consent to placing the completion agreement in operation. In general, the completion agreement provided for the completion of the construction of the project and the payment order of claimants, creditors and completion costs in four stages. To carry out this program, Aleutian Homes, Inc., Kodiak Construction Co. and Leo S. Wynans Co., Inc., agreed to vest in a Project Manager exclusive authority to take any and all action in connection with the project that they would be authorized to take, subject to the rights of HHFA defined therein.

Under the completion agreement the project manager (Harry M. Langton) was appointed with certain prescribed

1. See Appendix A.

duties and responsibilities and authority with respect to completion of the construction and payment of the claims against the project. Similarly a construction superintendent (Scott J. Cross) was selected to take charge of the physical completion of the project. Under this arrangement, the construction of 343 houses was completed on October 26, 1954. The 344th house was not erected because the lot provided therefor was found unsuitable for building.

By April 12, 1955, 341 out of the 343 houses constructed had passed FHA final inspection. The remaining two at that time were unacceptable for reasons relating to their foundations. Under the completion agreement, all claims listed in Stages 1 and 2 were paid, while only some of the claims in Stages 3 and 4 were paid.

The permanent individual mortgages were not taken out on any of said 341 houses and during June 1955, the FHA commitments to insure such mortgages and the FNMA commitments to purchase such mortgages at par expired.

The Navy determined that the cost in renting and the cost of utilities to occupants of Aleutian Homes, Inc. was more than the personnel and civilian employees could pay, and increased the rental allowance to military personnel living in the Aleutian Homes project in the amount of $37.50 a month for enlisted men and $36 a month for officers.

During the summer of 1957, the Navy indicated service personnel was to be reduced by 10 percent and civilian personnel by approximately 33⅓ percent.

HHFA made advances to or for the benefit of Aleutian Homes, Inc. for project construction costs in the total amount of $4,192,717.10 as follows:

1. Prior to the completion agreement (from June 25 to November 24, 1953) $3,330,062.68 (out of the total authorized loan of $4,230,900).

2. Subsequent to the completion agreement, $862,654.42 to the Aleutian Homes on requisition of the Project Manager. The difference between this total amount advanced by HHFA ($4,192,717.-10) and the total loan authorized ($4,-230,900) of $37,282.90 was withheld by reason of the one house not built and the two houses which by April, 1955, had not passed final FHA inspection.

In March, 1955, HHFA authorized advances in an amount not to exceed $160,-000 (in addition to the original loan of $4,230,900) to be made to Aleutian Homes, Inc., to be spent for the care and preservation of its security. HHFA advanced to Aleutian Homes, Inc. on March 15, 1955, $56,239.19, which amount was repaid to HHFA on May 5, 1956, together with $3,966.01, representing 7 percent interest on said sum from March 15, 1955, to May 5, 1956.

3. Interest under the note has been accruing at the rate of 5 percent. As of June 30, 1957, accrued interest claimed by HHFA to be due and unpaid was $211,105.65. As of December 31, 1959, accrued interest claimed by HHFA to be due and unpaid was $384,756.43, together with the principal balance.

HHFA received payments made by or on behalf of Aleutian Homes, Inc. in the total amount of $909,675.58 as follows:

1. Prior to the completion agreement (June 25 to October 31, 1953) $35,134.14.

2. After the completion agreement, from the project manager, $402,241.44.

3. Immediately prior to foreclosure HHFA withdrew from bank accounts maintained by the Aleutian Homes, Inc. Project Manager an additional $122,300.

4. From the court appointed receiver, $350,000.

FHA received fees for its commitments to insure, and extension thereof, the total sum of $22,360.

FNMA received fees for its commitments to purchase, and extension thereof, the sum of $106,422.77.

From July 1, 1954, through June 14, 1957, the Aleutian Homes, Inc. project manager received rentals from the project in the total amount of $1,114,800.20, and disbursed said funds as indicated in the records he maintained of the project. Most of said funds were disbursed.

During 1954, 1955 and 1956, plaintiff paid to the Bank of California, N. A., the following sums of money on the following dates in payment of the claim of the Bank of California, N. A., as set forth in the completion agreement:

| Date of Payment | Amount Paid | Credited To |
|---|---|---|
| Feb. 18, 1954 | $ 1,083.33 | Interest |
| June 2, 1954 | 1,875.00 | Interest |
| Aug. 20, 1954 | 1,875.00 | Interest |
| Dec. 6, 1954 | 1,895.83 | Interest |
| May 18, 1955 | 3,750.00 | Interest |
| May 18, 1955 | 41,455.00 | Principal |
| May 18, 1955 | 14,526.43 | Principal |
| June 13, 1955 | 2,352.75 | Principal |
| July 11, 1955 | 2,352.75 | Principal |
| Aug. 12, 1955 | 890.56 | Interest |
| Sept. 13, 1955 | 285.31 | Interest |
| Sept. 13, 1955 | 2,063.69 | Principal |
| Sept. 28, 1955 | 658.25 | Principal |
| Oct. 10, 1955 | 653.27 | Interest |
| Oct. 10, 1955 | 25,591.13 | Principal |
| June 11, 1956 | 787.92 | Interest |
| July 6, 1956 | 1,499.58 | Interest |
| July 6, 1956 | 61,000.00 | Principal |

During 1954, plaintiff paid Brice Mortgage Company $35,000 in settlement of all claims of Brice Mortgage Company and Brice Realty Company against the project for alleged work done and service performed prior to the execution of the completion agreement.

During 1954, plaintiff paid $75,000 to the Administrator for use under a requirement to pay overhead under the overhead agreement and completion agreement that Ray B. Woodbury pay overhead therein described. Defendant made demands for additional overhead payments which Ray B. Woodbury did not make.

On September 18, 1956, plaintiff satisfied the judgment obtained by General Casualty Company on July 24, 1956, for the unpaid premium on the bond issued on behalf of Kodiak Construction Co., together with expenses relating thereto by the payment to General Casualty Company of the sum of $33,542.09. In the defense of said action R. B. Woodbury incurred legal fees and other expenses in the sum of $2,412.93.

HHFA on or about June 11, 1957, in the United States District Court for the District of Alaska, Third Judicial Division, Anchorage, commenced foreclosure proceedings in the name of the United States of America against Aleutian Homes, Inc., a corporation, Pacific Alaska Contractors, Inc., a corporation, Alex B. Carlton, doing business as Carlton Lumber Company, City of Kodiak, a municipal corporation of the Territory of Alaska, James C. Dougherty, Trustee under the Will of Hugh Dougherty, Lee Bettinger, Jack Hinckel, M. Justin Herman and David Oliver, as Trustees, Lindley R. Durkee and Melvin Frazier, as Trustees, and "Also all other persons or parties unknown claiming any right, title, estate, lien or interest in the real estate described in the complaint herein," defendants, Civil No. A–13,484. On June 14, 1957, upon the motion of plaintiff, the court appointed M. G. Gebhart re-

ceiver of the mortgaged property until further order of the court. On or about June 20, 1958, the court authorized the payment by the receiver to HHFA of $200,000 out of proceeds from operation of the project, and said $200,000 was paid to HHFA. On or about September 12, 1958, plaintiff amended its complaint by adding as defendants the Territory of Alaska, Kodiak Construction Co., a corporation, Leo S. Wynans Co., Inc., a corporation, and United States of America. On or about April 10, 1959, pursuant to request of the receiver, the court authorized the payment by the receiver to HH FA of $150,000 out of proceeds from operation of the project and said $150,000 was paid to HHFA.

### Plaintiff's Contentions.

Generally speaking, the plaintiff's contentions are:

1. that HHFA participated in the formulation of the completion agreement dated 4/23/54 and accepted the same, under the terms of which plaintiff (a) agreed to become a standby creditor as to his then existing claims, (b) agreed to advance further substantial sums of money, and (c) agreed to relinquish any further control and direction of the project.

2. that the construction and operation of the project subsequent to April 24, 1954, was under the control of HHFA, and plaintiff did in fact advance substantial funds to the project.

3. that in entering into the completion agreement and in assuming control over the construction and operation of the project, HHFA and the Administrator entered into and occupied a fiduciary relationship with respect to plaintiff, Aleutian Homes, Inc., creditors and other interested parties to the completion agreement.

4. that HHFA, its agents and employees, carelessly and negligently or deliberately and wilfully breached said fiduciary relationship by refusing to adopt a permanent long-range program of amortizing the Kodiak project in a manner which considered the claims of all the parties interested in the completion agreement and instead by proceeding to satisfy and prefer its own interests as a creditor from the assets of the project to the exclusion of the interests of said other persons.

5. that by reason of the alleged breaches of the alleged fiduciary obligation plaintiff was damaged in a substantial sum.

### Defendant's Contentions.

That the Federal Tort Claims Act (Title 28 U.S.C.A. § 1346(b) and §§ 2671 through 2680) is not applicable to the factual situation in this case and, consequently, the Court has no jurisdiction to proceed, in that:

(a) the alleged breach of duty is not a "negligent or wrongful act or omission" under the Tort Claims Act; and

(b) the acts of which plaintiff complains were in the exercise of a discretionary function and therefore not actionable under the express terms of the exceptions of the Tort Claims Act, Title 28 U.S.C.A. § 2680.

In view of my ultimate decision, it is not necessary to mention other points raised by defendant.

The testimony is clear and convincing that the defendant, acting by and through the Navy Department, was vitally interested in the construction of housing for Navy personnel at Kodiak. Likewise, the testimony clearly shows that plaintiff, through his corporations and individually, was interested in the construction from an investment viewpoint. All parties entered into the original agreements in entire good faith.

After Brice Mortgage Company was unable to arrange for long-term financing, it became a certainty that such financing could be obtained only through defendant's agencies. In my opinion the evidence is conclusive that no housing project would ever have been commenced at Kodiak if long-term financing had not been contemplated by defendant's agencies. If there ever was any doubt on the subject of long-term financing, that doubt was removed when financial difficulties

arose and construction ground to a halt in the fall of 1953.

A large scale housing project in Kodiak, Alaska, such as here contemplated, could not be successful unless supported by Navy personnel. That the Navy was vitally interested is clearly shown by the certificate of the Secretary of the Navy made in 1952 in which he certified to FHA the critical need of the Navy for 385 family units for use by military and civilian personnel at Kodiak Naval Base, the permanency of the Kodiak Naval Base and the ability of such military and civilian personnel to pay rentals as indicated on page 929 of this Opinion. Defendant was even more deeply involved in October and November 1953 when certain liens were filed against the project. Construction came to a standstill when the project was approximately 75 percent complete. Prior to the signing of the completion agreement, defendant, through HHFA, advanced $3,330,062.28 on the project. When we look at this agreement in light of the huge investment in the project then held by defendant, we can readily understand why defendant's agency wanted absolute control removed from the hands of plaintiff and his organizations and placed in the hands of defendant's agency.

The evidence is undisputed that HHFA played a major part in all of the negotiations leading up to the signing of the completion agreement on April 23, 1954. Certainly, defendant's agency is not to be criticized for attempting to save an investment of approximately three and one third million dollars. If the project was not completed, the investment would be worthless. In my opinion this agency, under the facts then existing and under the powers granted by Congress, had full right and authority to complete the project, if it so desired. All parties concluded that it was for the best interests of everyone concerned to proceed with the construction under the direction of a Project Manager. It is true that neither HHFA nor the Administrator signed the completion agreement. However, it is crystal clear that all parties to the agreement anticipated that HHFA would formally accept such obligations as it had under the terms of this agreement. I am not attempting to distinguish between HHFA and the Administrator. The agreement refers to the Administrator as the "Lender", and he will be herein referred to as "Lender." Under its terms certain promises were made in order to induce Lender to disburse further proceeds of the loan. The parties agreed to sign all documents required by the Lender. All income from the project and other proceeds were to be assigned to the Lender. Plaintiff agreed to provide certain overhead expenses required by the Lender estimated at $16,000 per month. The Project Manager had to be acceptable to the Lender and was vested with full and exclusive authority to take all action necessary in connection with the project, subject to the *general direction* of the Lender. Any and all subcontractors had to be approved by the Lender. The Project Manager was subject to removal on the request of the Lender. In truth and in fact, the Lender had an absolute right to designate the Project Manager and discharge him if Lender so desired. The bank account from which disbursements were made for the completion of the project was in the name of the Lender and the Project Manager. In other words, when the funds were disbursed by the Lender under its commitment, such funds were transferred to a bank account over which the Lender had absolute control. The construction superintendent had to be acceptable to the Lender and was subject only to the direction of the Project Manager and, by inference, subject to removal only by the Project Manager.

The language in paragraph 18 of the agreement indicates that the only reason it was not signed by HHFA or the Administrator (Lender) was a doubt as to whether the law authorized such execution. The agreement did require written or oral approval by the Lender. The Lender gave written approval of the agreement. Outside of the terms and provisions of the completion agreement

the evidence is overwhelming that the Lender in truth and in fact took over absolute control of and proceeded with the completion of the project.

■■ In my opinion the fact that the completion agreement was not signed by Lender is of no significance. Contractual liability under a written contract may be assumed without signing it. Girard Life Insurance Annuity & Trust Co. v. Cooper, 162 U.S. 529, 16 S.Ct. 879, 40 L.Ed. 1062; Laurent v. Anderson, 6 Cir., 1934, 70 F.2d 819; First National Bank of Sleepy Eye, Minn. v. Sleeper, 8 Cir., 1926, 12 F.2d 228; Commercial Standard Insurance Co. v. Garrett, 10 Cir., 1934, 70 F.2d 969. In fact, the Lender in this case accepted the completion agreement in writing. The validity and construction of contracts through which the United States is exercising its constitutional functions, their consequences on the rights and obligations of the parties and the titles or liens which they create or permit present questions of federal law not controlled by the laws of any state. United States v. Allegheny County, 322 U.S. 174, 182, 64 S.Ct. 908, 88 L.Ed. 1209; S. R. A., Inc. v. State of Minnesota, 327 U.S. 558, 564, 66 S.Ct. 749, 90 L.Ed. 851; United States v. Jones, 9 Cir., 1949, 176 F.2d 278.

Defendant argues that under well established legal principles defendant cannot occupy the position of a fiduciary. Restatement of the Law, Trusts 2d, § 95; United States v. Waylyn Corp., D.C. D.Puerto Rico 1955, 130 F.Supp. 783, affirmed Waylyn Corp. v. United States, 1 Cir., 1956, 231 F.2d 544, certiorari denied 352 U.S. 827, 77 S.Ct. 40, 1 L.Ed. 2d 49. Those authorities are not in point. Lender was delegated broad general powers by the Congress to go forward with prefabricated housing and in particular with housing in Alaska. 15 U.S.C.A. § 603; 12 U.S.C.A. § 1749a; 12 U.S.C.A. § 1701g-2; Federal Housing Administration Region No. 4 v. Burr, 1939, 309 U.S. 242, 60 S.Ct. 488, 84 L.Ed. 724.

■■ If the United States Government, or any branch thereof, enters into a contract with an individual, natural or corporate, and does so in its private or business capacity and not as a sovereign, it submits itself to the same rules of law which govern the construction of contracts between individuals. S. R. A., Inc. v. State of Minnesota, supra; Reading Steel Casting Co. v. United States, 268 U.S. 186, 45 S.Ct. 469, 69 L.Ed. 907; Lynch v. United States, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434. In a case such as this, where the governmental agency is acting in a commercial field, with the full authority and consent of Congress, that agency should not be less amenable to the ordinary rules of law than would be a private enterprise under like circumstances. Keifer & Keifer v. Reconstruction Finance Corp., 1938, 306 U.S. 381, 59 S.Ct. 516, 83 L.Ed. 784; Federal Housing Administration v. Burr, supra.

Defendant forcefully argues that United States v. Waylyn Corp., supra, is authority for its proposition that defendant could not be a fiduciary under the circumstances of this case. In that case the United States instituted a suit to foreclose a loan. Defendant corporation counterclaimed for damages on a theory that the United States breached a certain fiduciary relationship in not doing certain things to enable defendant's apartment buildings to become self-supporting and self-liquidating. Plaintiff's motion to dismiss the counterclaim was allowed. The Court, in passing on the coverage of the counterclaim under the Federal Tort Claims Act, stated that the acts complained of and on which the counterclaim was based were obviously an exercise of a discretionary function and would fall within the exception contained in § 2680(a). The case *does not hold* that the government cannot occupy a fiduciary relationship.

■■ I am of the opinion that the Lender could legally occupy the legal status of a fiduciary in connection with the completion of the housing project in question. Furthermore, I find and hold that the Lender took over full and complete control of such project and, in so doing, was acting in a fiduciary capaci-

ty with the plaintiff. A more detailed statement of the evidence in support of this conclusion is neither necessary nor desirable.

The completion agreement was accepted by the Lender by letter dated April 27, 1954. The identical resolutions of Kodiak Construction Co. and Aleutian Homes each authorizing the signing of the completion agreement also turned complete control of the project over to a Project Manager who had to be acceptable to the Lender. The Lender designated the Manager's powers, duties, compensation and tenure. The same sort of an arrangement was made by resolution of each corporation in connection with the appointment of a Construction Superintendent acceptable to Lender. The Lender had full charge and control of the powers, duties, compensation and tenure of such Superintendent. In part the resolution read:

" * * * Now, Therefore, in order to indice Lender to accept Completion Agreement and in order to comply with the provisions thereof, this corporation does hereby:

* * * * * *

"2. Authorize the employment and appointment of a 'Project Manager' sho shall be vested with full and complete authority to do every act and thing which this corporation could do by its regularly elected directors and officers in connection with any manner or thing connected with said Project, and this corporation does further authorize the officers of this corporation to appoint such person and any successor thereto as may be acceptable to Lender to enter into an agreement with such person or persons designating his powers, duties, compensation and tenure, such agreement to be in accordance with the terms and conditions of such Completion Agreement and subject to the approval of the Lender; * * *"

█ It is clear from all pertinent parts and provisions of the completion agreement, taken together and considered in light of the facts and circumstances surrounding the transaction at the time of execution, and the actions of the parties subsequent thereto, that the obligation of the Lender to furnish long-term financing was within the contemplation of the parties and was necessary to carry their intentions into effect. In such case the obligation will be implied and enforced. Stern v. Dunlap Co., 10 Cir., 1955, 228 F.2d 939; Northeast Clackamas County Electric Co-op v. Continental Casualty Co., 9 Cir., 1955, 221 F.2d 329; Sacramento Navigation Co. v. Salz, 273 U.S. 326, 47 S.Ct. 368, 71 L.Ed. 663; Hudson Canal Co. v. Pennsylvania Coal Co., 8 Wall. 276, 75 U.S. 276, 19 L. Ed. 349.

█ A person in a fiduciary relation to another is under a duty to act for the benefit of the other as to matters within the scope of the relation. Such relation is defined in Black's Law Dictionary, 4th Ed., 753; Farrow v. Dermott Drainage District, 8 Cir., 1944, 139 F.2d 800, 805:

"A relation subsisting between two persons in regard to a business, contract, or piece of property, * * * of such a character that each must repose trust and confidence in the other and must exercise a corresponding degree of fairness and good faith. Out of such a relation, the law raises the rule that neither party may * * * take selfish advantage of his trust, or deal with the subject-matter of the trust in such a way as to benefit himself or prejudice the other except in the exercise of the utmost good faith and with the full knowledge and consent of that other."

Already I have mentioned that the only source of long-term financing in the area was through the federal loan agencies. In my opinion an agreement to provide such long-term financing was as much a part of the completion agreement as if it had been specifically mentioned. The providing of such financing was one of the duties of the Lender when it moved in and took complete control of the project. The Lender did not provide this long-

term financing. On the other hand, it commenced foreclosure proceedings.

Likewise, the fact that the completion of the project required a larger expenditure of funds than was anticipated at the time of execution of the completion agreement is something which must have been within the contemplation of the parties and an implied agreement on the part of the Lender should be read into the contract to provide long-term financing for such additional funds.

Whether the Lender, under the evidence in the case, was justified in refusing to go forward with the long-term financing is a question which I need not decide. I have already concluded that defendant could act as a fiduciary and was acting in a fiduciary or confidential capacity in assuming control over the completion of the project and the long-term financing. Assuming, *arguendo*, and I would so hold if I felt I had jurisdiction, that defendant in truth and in fact breached its duty in failing to provide, without justification, said long-term financing, is such breach of duty a "negli-

gent or wrongful act or omission" within the meaning of the phrase as used in the Federal Tort Claims Act?

I now approach the vital question of jurisdiction under the Tort Claims Act. The hearings before the Committee on the Judiciary, House of Representatives, 77th Cong., 2d Sess. on the pending Tort Claims Act quite conclusively show that Congress did not contemplate waiver of the government's immunity for all tortious conduct.[2] Mr. Justice Reed, author of the opinion in the important case of Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 964, 97 L.Ed. 1427, in commenting on this legislative history, said:

"\* \* \* Uppermost in the collective mind of Congress were the ordinary common-law torts. Of these, the example which is reiterated in the course of the repeated proposals for submitting the United States to tort liability is 'negligence in the operation of vehicles.' \* \* \*"

Assuming that the violation of a duty imposed by the fiduciary relationship cre-

2. Statement to the Committee by Francis M. Shea, Asst. Attorney General:

"If enacted, H.R. 6463 would broaden the existing authority to make administrative adjustment of tort claims, extending it to include claims for personal injury and death as well as for property loss or damage. It would also remove an existing inequality in our law which permits suit to be brought against the United States for certain types of tort claims, such as admiralty and maritime torts, and yet precludes suit *on the ordinary common-law type of tort, such as personal injuries or property damage resulting from negligent operation of an automobile.* \* \* \*

"The past 85 years have thus witnessed a steady encroachment upon the doctrine of sovereign immunity. Yet there remains a large and important category of wrongs for which there is as yet no satisfactory remedy—*the ordinary common-law type of torts, such as personal injury or property damage caused by negligent operation of an automobile by a government employee in the course of his employment.* \* \* \*

"\* \* \* It is neither desirable nor intended that the constitutionality of legislation, the legality of regulations, *or the propriety* of a discretionary administrative act should be tested through the medium of a damage suit for tort. The same holds true of other administrative action not of a regulatory nature, such as the expenditure of Federal funds, the execution of a federal project, and the like.* \* \* \*"

"Memorandum for use of the Committee on the Judiciary

"The survival of government irresponsibility in the field of common-law torts is an anachronism, founded upon no sounder reason than a historical prejudice against tort claims. *No acceptable justification has ever been cited for this immunity* and in an area of steadily growing *government activity, involving considerable use of automobiles and other mechanical equipment capable of causing damage to person and property, the absence of a satisfactory procedure for redressing such wrongs becomes a grave defect in our social policy.*" (Emphasis added.)

ated in this case is tortious conduct, Restatement of the Law, Torts, § 874; Harper v. Interstate Brewery Co., 1942, 168 Or. 26, 120 P.2d 757, does such violation fall within the provisions of the Tort Claims Act? I think not. The Restatement, in Chap. 43, classifies the violation of a fiduciary duty as tortious under rules applicable to certain types of conduct. Negligence is treated in an entirely separate and distinct volume of such work. In construing the Tort Claims Act the courts have uniformly held that immunity was not waived as to all torts. Immunity was not waived for conduct amounting to a nuisance. Dalehite v. United States, supra. The Act does not impose absolute liability for the ownership and operation of a dangerous instrumentality. United States v. Ure, 9 Cir., 1955, 225 F.2d 709; Porter v. United States, D.C., 128 F.Supp. 590, affirmed 4 Cir., 228 F.2d 389. The act does not impose liability without fault. Harris v. United States, 10 Cir., 1953, 205 F.2d 765. Although fraud and deceit may constitute tortious conduct, such conduct does not fall within the provisions of the Act. United States v. Gill, D.C.W.D.Pa. 1957, 156 F.Supp. 955. The courts, by inference, in construing the language "negligent or wrongful act or omission" have applied the well-known rule of ejusdem generis. Under this rule the general words in a statute *(or wrongful act or omission)* are confined to the class which it has specifically described *(negligent)* and may not be used to enlarge the meaning of such word. Cleveland v. United States, 329 U.S. 14, 67 S.Ct. 13, 91 L.Ed. 12; Fourco Glass Co. v. Transmirra Products Corp., 353 U.S. 222, 77 S.Ct. 787, 1 L.Ed.2d 786; Haili v. United States, 9 Cir., 1958, 260 F.2d 744; In re Application of Rogers, 9 Cir., 1956, 229 F.2d 754.

It is true that the Courts have construed the language to cover certain acts which are not strictly negligent in nature. However, the wrongful acts in such cases were closely related to negligence. For example, the Court in Hatahley v. United States, 1956, 351 U.S. 173, 181, 76 S.Ct. 745, 100 L.Ed. 1065, held that a trespass, in the confiscation of horses, was such a wrongful act as was contemplated. Likewise, in Aleutco Corp. v. United States, 3 Cir., 1957, 244 F.2d 674, it was recognized that the wrongful conversion of certain property by the United States constituted a compensable wrongful act. United States v. Ein Chemicals Corp., D.C.N.Y.1958, 161 F.Supp. 238, supports Aleutco's holding that the wrongful conversion of property is such tortious conduct as is covered by the language in question. Plaintiff urges that under the plain language of the Act the defendant is liable if a private person would be liable. Clearly, this language must be read and construed with the other language of the Act. The test would be whether a private person would be liable to the plaintiff for "negligent or wrongful act or omission" of a government employee as defined and limited by the legislative history and court decisions construing the Act.

I feel that the Lender, when it accepted the completion agreement and took over control of the project under which it was to provide long-term financing, was not acting in the exercise of a discretionary function. The Lender had an absolute obligation to furnish such long-term financing.

I express no opinion on the statute of limitations nor the legal effect, if any, of the indemnity agreements executed by plaintiff.

I conclude that I have no jurisdiction under the Tort Claims Act and that this cause must be dismissed without prejudice. No testimony was taken on defendant's counterclaim and that issue is not before the Court. If the government decides to proceed in this Court on such counterclaim, a trial date will be assigned.

This opinion shall stand as my findings and conclusions on plaintiff's claims. An appropriate judgment of dismissal without prejudice shall be prepared and presented.

## Appendix A

### Completion Agreement

This Agreement made and entered into this 23 day of April, 1954, by and between the following parties:

1. Aleutian Homes, Inc., an Oregon Corporation, herein called "Owner";

2. Kodiak Construction Company, an Oregon corporation, herein called "General Contractor";

3. Leo S. Wynans Co., Inc., an Oregon corporation; Pacific Alaska Contractors, Inc., an Alaskan corporation; and Alex B. Carlton, doing business as Carlton Lumber Company, hereinafter referred to individually by name or collectively as "Sub-contractors";

4. Copenhagen & Co., Friberg Electric Co., Lee and Dierickx of Portland, Oregon, hereinafter referred to as "Subcontractors";

5. General Casualty Company of America, a Washington corporation, United Pacific Insurance Company, a Washington corporation, United States Fidelity and Guaranty Company, a Maryland corporation, the Fidelity and Casualty Company of New York, a New York corporation, and United National Indemnity Company, a New York corporation, hereinafter referred to as "Corporate Sureties", and General Casualty Company of America, as a creditor;

6. All of the major creditors of Owner, General Contractor and Sub-contractors executing this Agreement are hereinafter called "Principal Creditors";

7. R. B. Woodbury, G. K. Gosling, Lucille B. Woodbury and Hazel M. Nau, Stockholders of Aleutian Homes, Inc. and R. B. Woodbury, Donald R. Wilson, Leo S. Wynans, Helen McFetridge, and Hazel M. Nau, stockholders of Kodiak Construction Co. all herein collectively referred to as "Stockholders";

8. R. B. Woodbury, as guarantor of performance of Building Loan Agreement and General Contract; and

9. Brice Mortgage Company, an Oregon corporation, herein called "Take-Out Mortgagee".

10. Employers Mutual Liability Insurance Company of Wisconsin, a Wisconsin corporation, the workmen's compensation carrier of Leo S. Wynans Co., Inc.

Whereas, Owner has been engaged in constructing a certain housing project consisting of some 344 houses at Kodiak, Alaska, urgently needed by Naval personnel (herein called "Project") which Project is being financed by a loan of $4,230,-900 secured by Deed of Trust made by Housing and Home Finance Administrator, hereinafter called "the Lender"; and

Whereas, a number of creditors of the Owner, the General Contractor and Sub-contractors have past due accounts and Lender is unwilling to make further disbursements on said loan because of said unpaid creditors, liens filed against the Project, and other defaults under said loan; and

Whereas, it is in the best interests of the national defense and of all parties hereto and of Lender, and all other persons having an interest in said Project, to proceed with an early completion of the Project and for an orderly and early retirement of all outstanding bills, claims and liens against the project;

Now, Therefore, in consideration of the mutual promises contained herein, and in order to induce Lender to make and disburse further proceeds of the loan or any part thereof, it is hereby agreed subject to all the terms and conditions hereof as follows:

1. All parties hereto agree to accept in full payment and discharge of all claims of whatever nature (herein called "Claims") against Owner, Contractor and Sub-contractors, and their sureties, which each such party may have as of the date of this Agreement against the said Owner, Contractor and Sub-contractors the amount set forth opposite their names in the Schedule hereto attached, marked Exhibit "A", or in the event that any party cannot substantiate to the Lender the amount set forth in said Schedule, then such party agrees to accept in full payment such lesser amount as he can establish to the Lender.

2. All parties hereto agree that payment of all Claims against Owner, Contractor and Sub-contractors, the payment of costs of completion of Project, and all other claims, costs and expenses in connection with said Project shall be paid in the manner set forth in Exhibit B attached hereto and by this reference incorporated herein the same as if set forth in full herein.

3. Each of the parties hereto agrees that during the continuance of this Agreement he will not bring or prosecute any action or legal proceeding whatsoever including, but not by way of limitation, the filing of liens, actions at law or equity, bankruptcy or receivership proceedings, against the Owner, the Contractor, the Sub-contractors, or their sureties, the Project, or R. B. Woodbury, individually, or Leo S. Wynans, individually, and further agree not to in any way attach or interfere with said persons, their goods or estates for or on account of any of Claims of the Parties hereto against said persons.

4. Each party agrees upon payment to him of the amount specified in paragraph 1, that he will execute and deliver a legally sufficient and complete release and discharge of said Claim and to execute any and all additional documents in connection with said release as may be required by the Lender or the Title Guaranty and Trust Company of Alaska.

5. Owner agrees to assign to Lender all proceeds of permanent first mortgages for Project, tax credits and any other assets of the Owner not hypothecated as security for first mortgage indebtedness, and income from Project to the extent, if any, permitted by Federal Housing Administration and Federal National Mortgage Association, the proceeds thereof to be disbursed by Lender in accordance with this Agreement and further empowers Lender upon the retirement of loan made by Lender to transfer such assets to a trustee appointed by the then remaining creditors or Claimants who are signatories hereto for disposition in accordance with this Agreement.

6. Pacific Alaska Contractors, Inc., ——————— ——————— and ——— ———, each of whom has heretofore filed a claim of mechanics' lien in connection with this Project in consideration of the execution of this Agreement by all of the parties hereto agree that concurrently with the execution of this Agreement they will execute additional Agreements not to commence suit or take any other action under mechanics' lien claims filed by them and further agree that upon payment to them of the following amounts set opposite their names in this paragraph that such lien claimants will release and discharge such mechanics' lien claims and all rights thereunder:

| Pacific Alaska Contractors | $ 90,000.00 |
|---|---|
| ——————— | $ . |
| ——————— | $ |
| ——————— | $ |
| ——————— | $ |

7. R. B. Woodbury, individually, agrees to execute and deliver to Lender an Agreement, in form and substance acceptable to Lender, to provide necessary overhead expenses for the completion of the Project in such amounts as shall be required by Lender estimated at $15,000 per month and to provide security acceptable to the Lender for the payment of such overhead expenses.

8. (a) Owner, General Contractor, and Leo S. Wynans, Inc. jointly and severally agree to designate and appoint a Project Manager (herein called "Project Manager") acceptable to Lender, who shall be vested with full and exclusive authority by Owner, by General Contractor, and by Leo S. Wynans, Inc. to take any and all action on their behalf in connection with Project which they would be authorized to take, subject to general direction of Lender, *provided however*, that Lender shall approve any Sub-contractors engaged to complete the Project or any parts thereof.

(b) Project Manager shall be subject to removal upon request of Lender at any

time. In the event of death, resignation, removal or incapacity of Project Manager, his successor shall be appointed in the manner set forth under (a) above.

(c) Compensation of Project Manager shall be considered to be an overhead expense payable out of funds to be supplied by R. B. Woodbury and the amount thereof shall be approved by Lender and R. B. Woodbury.

9. Owner, Kodiak Construction Company, and Leo S. Wynans, Inc. also jointly and severally agree to designate and appoint a Construction Superintendent acceptable to Lender, who shall have full authority over all construction necessary to complete this project including all Sub-contractors and who shall be subject only to the direction of the Project Manager mentioned in paragraph 8 above.

10. Claimants, or any of them agree to execute and deliver to Lender such additional Stand-by Agreements which shall conform to the schedule of priority of payment set forth in Exhibit B as Lender shall require;

11. This Agreement is subject to compliance with the following conditions by Lender:

(a) Lender will supervise disbursement of all funds to the persons shown to be entitled on Exhibit A and funds required for completion directly to the persons supplying services, materials, or other thing of value, such disbursements to be supported by vouchers and such other evidences as Lender shall require;

(b) Lender will modify Disbursement Procedure to authorize disbursements of loan funds in accordance with this Agreement;

(c) Lender will defer collection of interest due under loan until completion of Project, such interest to be paid out of proceeds of sale of permanent first mortgages to Federal National Mortgage Association, it being understood, however, that this Agreement shall in no wise affect the accrual of interest as provided under Note executed by Owner to Lender dated April 27, 1953;

(d) Lender will further extend maturity date of Note dated April 27, 1953, previously extended to April 30, 1954, to October 31, 1954;

12. The failure of any party to sign or become obligated under this Agreement shall not release or affect the liability of any party signatory hereto, nor shall the Agreement be affected by the death, disability, or bankruptcy of any signatory hereto;

13. The obligations of any party signatory hereto shall not be released, discharged, or in any way affected, nor shall Claimants or other parties signatory have any rights or recourse against Lender by reason of any action Lender may take or omit to take under the foregoing powers; nor by reason of any action taken by Lender which in its opinion may be necessary to keep said project free from liens;

14. All provisions and requirements of loan documents executed in connection with loan by Lender to Owner shall remain in full force and effect, except as expressly modified;

15. All parties signatory hereto agree to execute or cause to be executed such other agreements, instruments, documents, or required evidences as Lender shall require to effectuate the provisions of this Agreement, in form and substance acceptable to Lender;

16. This Agreement shall inure to the benefit of and be binding upon the heirs, representatives and assigns of the parties hereto;

17. This Agreement is prepared in an original and five duplicate originals and the signature to any such duplicate original shall be regarded as a signature to the original;

18. No provision has been made for execution of this document by the various Federal, State and Territorial agencies who are Claimants or by the Bank of California since the national banking laws and the laws and regulations affecting such agencies do not authorize the execution of such Agreement. It is un-

**942**

derstood that either a written or oral approval of this Agreement will be obtained from them, if possible.

19. Signature by any corporate surety herein named does not constitute an admission by any surety that it is obligated to any party named herein for the amount stated herein nor any other amount.

In Witness Whereof, the parties hereto have caused these presents to be executed the day and year first above mentioned; the corporate signatories hereto having caused these presents to be signed by their duly authorized officers or agents pursuant to resolutions of their boards of directors; the partnership signatories by a general partner thereof or a duly authorized agent and all individuals, individually and in person.

(Signatures and attached exhibits omitted)